## Dwight Estate.

Argued April 16, 1957.  Before, JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

522

*Charles Morris Hamilton,* with him *William H. Rivoir, Jr.,* for appellant.

*J. Montgomery Forster,* with him *Clarence L. Walker,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 28, 1957:

On November 18, 1926 E. Waterman Dwight, then a person of substantial means, executed a will. Under this will he created a *primary* trust of $300,000 for two relatives and their descendants and then created a *secondary* trust of which his residuary estate was the corpus and two grandnieces were the principal beneficiaries. Under the latter trust the income was payable to the two grandnieces for life, with succeeding life estates in their issue; the principal was to be distributed to such of their issue as should be living twenty-one years after the death of the survivor of the two grandnieces and/or such of their children as might be living at the time the testator died; in default of lineal descendants, the testator provided for cross remainders and gifts over to the primary trust. Any principal or income which remained undisposed of was given to the University of Pennsylvania.

On October 25, 1928, the testator, by a codicil (hereinafter termed first codicil), modified that paragraph of his will which created the *secondary* trust (Third Paragraph). In that codicil the testator directed his

trustees to "first pay out of the income of my residuary estate the sum of Five Hundred Dollars ($500.) each month after my decease to Helen Elizabeth Barck for and during her natural life and the balance of said income as therein directed".

*On the same day* the testator by another codicil (hereinafter termed second codicil) further modified the same paragraph of the will. Therein the testator directed that "in addition to the payment out of income of my residuary estate directed in said Codicil, [the first codicil] there shall also be paid to Ethel Heberton Harris the sum of One thousand Dollars ($1,000.) each month after my death, for and during the term of her natural life, and the balance of income only as directed in the Third clause of my said Will."

By two later codicils the testator increased Miss Barck's bequest to $1,000 monthly, revoked the original primary trust and created a new primary trust of $200,-000 for the benefit of a niece.

With the exception of the University of Pennsylvania, Miss Barck and Mrs. Harris,[1] every beneficiary under the will and various codicils was a relative of testator.

The testator died March 7, 1934. His net estate—after payment of debts, taxes and administration expenses—was less than $200,000.[2] The primary trust could not be set up due to the lack of funds until almost four years subsequent to testator's death. Further, as the result of a lack of funds, no substantial payments toward the monthly bequests to Miss Barck and Mrs. Harris could be made until long after the primary trust was established. Miss Barck died on September 20,

---

[1] Miss Barck and Mrs. Harris were friends of testator, the latter being the daughter of a life long friend of the testator.

[2] As a result of the economic depression, testator's estate had greatly diminished in value.

1951 and at the time of her death she had not received in full the monthly payments directed in the first and third codicils. After Miss Barck's death, the entire net income from the residuary estate was paid to Mrs. Harris until her death on September 8, 1955.

When the trustee filed its fourth account the entire balance in the secondary trust consisted of personalty valued at $88,785.15. At the audit of this account Mrs. Harris' personal representative (hereinafter called appellant) presented a claim in excess of $200,000, representing arrearages in monthly payments due Mrs. Harris under the second codicil. This claim was based upon two contentions: first, that the bequest to Mrs. Harris was a legal "annuity" and, as such, was entitled to be paid, since the income was insufficient to meet the payments under the bequest, out of the corpus of the trust; second, that, in any event, the arrearages must be paid out of income realized and to be realized after Mrs. Harris' death until all of the arrearages have been paid.

Judge BOLGER, the auditing judge, dismissed both these contentions and awarded the principal of the trust to the trustee to pay the income therefrom to decedent's grandniece in accordance with the Third Paragraph of the will as modified. Exceptions having been filed to this adjudication, the exceptions were dismissed[3] and the adjudication was confirmed by Judge SAYLOR, speaking for the court en banc of the Orphan's Court of Philadelphia County. From the final judgment entered by that court this appeal was taken.

Appellant's first position is that Mrs. Harris' bequest was an "annuity" for the payment of which, since the income from the trust was insufficient, the corpus of the trust may be invaded.

---

[3] An exception based on a finding of estoppel by the auditing judge was sustained.

The term "annuity" is difficult of definition. The classic definition of an "annuity" is that of Sir Edward Coke: "Coke, whose definition has, substantially, been adopted by all the text writers (2 Blacks. 40; 3 Kent, 460; Addison on Contracts, 982; 2 Williams on Executors, 885; &c., &c., &c.) says (Co. Litt., 144 b.), 'an annuity is a yearly payment of a certain sum of money granted to another in fee for life, or years, charging the person of the grantor only' ": *Bayard's Estate,* 7 DR. 279, 281. At common law a yearly sum charged on the person of the grantor was an "annuity"; however, an annual payment charged on land was a "rent charge" and a sum payable annually by trustees was not an "annuity". It must be recalled that the common law "annuity" was created not by will, but rather by deed or by contract: therefore, the classic definition of an "annuity" does not encompass an "annuity" created by a will or trust.

In *Commonwealth v. Beisel,* 338 Pa. 519, 521, 13 A. 2d 419, former Chief Justice STERN very aptly defined an "annuity" as a ". . . term somewhat loosely used in financial and legal nomenclature and is perhaps incapable of exact definition. Generally speaking, it designates a right—bequeathed, donated or purchased— to receive fixed, periodical payments, either for life or a number of years. Its determining characteristic is that the annuitant has an interest only in the payments themselves and not in any principal fund or source from which they may be derived".

The distinction between income and an "annuity" was described in *Ex Parte McComb,* 4 Bradf. (N.Y.) 151: "There is a distinction between income and an annuity. The former embraces only the net profits after deducting all necessary expenses and charges (and may be uncertain in amount) ; the latter is a fixed amount directed to be paid absolutely and without contingency".

One of the difficulties encountered in defining an "annuity" is the fact that the meaning of the word is so often confused with the method or source of its payment. Adopting the definition that an "annuity" is a right "to receive fixed, periodical payments, either for life or a number of years" it does not necessarily follow that *every* "annuity" is payable out of corpus or income in subsequent years in the event that the income for a particular year or years becomes deficient for payment of the "annuity". There is no magic in the word "annuity", although some courts attach to the definition of an "annuity" the method for or the source of its payment.[4] Whether a particular bequest is an "annuity" or a "gift of income" may be determinative of the quantum of the bequest, yet only a construction and interpretation of the will or the trust will decide the manner of payment of the bequest in the event that the income becomes deficient for the purpose.

The fact that a testator or settlor uses the word "annuity" in a will or trust is of great significance in determining the intention of a testator or settlor and whether a particular bequest was intended to be a "gift of income" or an "annuity": *MacMackin Estate,* 356 Pa. 189, 192, 193, 51 A. 2d 689; *Pusey Estate,* 370 Pa. 572, 577, 88 A. 2d 750; *Elmore Estate,* 379 Pa. 155, 156, 108 A. 2d 803. However, in the face of a contrary expression expressed in the will or trust, the mere use of the word "annuity" should not be controlling in the determination of the source or manner of its payment.

The right of a legatee—whether he be an annuitant or the recipient of a gift of income—to have an income deficiency made good out of the corpus of a fund does not depend upon any rule of law, but rather upon the intent of the settlor or testator gleaned from the will

---

[4] Page on Wills (Lifetime Ed.), Secs. 1172 et seq.

or trust provisions and his relationship to the objects of his bounty.[5] In *In Re West,* 1 Ir. 75, it was said: "The question is always a question of intention. Numerous cases have been referred to, and in this great mass of authority scarcely any settled principles have been arrived at. In nearly every case the decision has turned upon the special words used and the connection in which they occur, affording no light whatever in cases where the words used are different or used in a different connection. What few principles are arrived at are subject to exceptions so numerous and so minute as to be scarcely recognizable as principles at all". The solution of the problems presented upon this appeal does not require that we give a "name" to Mrs. Harris' bequest. We simply are called upon to decide whether under the provisions of the will and codicils the testator intended that any deficiency in income to pay her bequest should be made up out of corpus or income accumulated or received in subsequent years.

Appellant's contention—that Mrs. Harris' bequest, unpaid to a great extent during her lifetime, must now be paid either by invading the principal of the trust or by utilizing income from the trust realized since her death—can only be resolved by an examination of the terms of the will and the codicils. In the course of such examination we must construe the will and the codicils as one instrument (*Foster's Estate,* 324 Pa. 39, 44, 187 A. 399; *Braun Estate,* 358 Pa. 271, 275, 276, 56 A. 2d 201; *Buzby Estate,* 386 Pa. 1, 8, 123 A. 2d 723), bearing in mind that the purpose of a codicil ordinarily is to modify or add to a will and that it only changes the will to the extent that it might be inconsistent therewith (*Buzby Estate,* supra; *Boyer Estate,* 372 Pa. 553,

---

[5] 2 Am. Jur., §19, p. 825; Scott on Trusts (2nd Ed.), Vol. D, §1287, pp. 953-958; 96 C.J.S. §902, pp. 351-354.

556, 94 A. 2d 721). In endeavoring to ascertain what decedent intended in making this bequest to Mrs. Harris, the language of the late Mr. Justice ALLEN STEARNE in *Mulert Estate,* 360 Pa. 356, 61 A. 2d 841, is particularly appropriate: ". . . This intention is to be gathered from the whole will and is not limited to any particular clause: Williamson's Estate, 302 Pa. 462, 153 A. 765; MacMackin Estate, 356 Pa. 189, 51 A. 2d 689; March Estate, 357 Pa. 216, 53 A. 2d 606; Siple et ux. v. Greumelli, 357 Pa. 237, 53 A. 2d 607. Every will is in a sense unique and therefore precedents are of little value; Kirkpatrick's Estate, 280 Pa. 306, 124 A. 474; Brennan's Estate, 324 Pa. 410; 188 A. 160; Jackson's Estate, 337 Pa. 561, 12 A. 2d 338. Each will is its own best interpreter, and a construction of one is no certain guide as to the meaning of another: Bechtel v. Fetter, 267 Pa. 173, 111 A. 50; Williamson's Estate, supra; Emmerich Estate, 347 Pa. 307, 32 A. 2d 400."

Under the will no provision was made either for Miss Barck or for Mrs. Harris and it was not until two years later that through the medium of the two codicils provisions were made for them. A comparison of the language of the two codicils *executed on the same day* in 1928 is highly instructive. The first codicil states that the trustees *"shall first pay out of the income of my residuary estate the sum of Five Hundred Dollars ($500.) each month . . . to Helen Elizabeth Barck for and during her natural life and the balance of said income as therein directed."* Certain of testator's words and phrases in this codicil are significant; by the use of the words "first pay" testator earmarked the primary payment out of the income for Miss Barck; the clause "out of the income of my residuary estate" indicates the source from which testator directed payment to be made; the clause "the balance of said income as therein directed" not only indicates that testator con-

templated that the income from the secondary trust would exceed the amount of Miss Barck's bequest but it constitutes a direction that the balance or excess of income is to be distributed in accordance with the Third Paragraph of the will.

After a recitation that it constitutes a *further* modification of the Third Paragraph of the will, the second codicil directs *"that in addition to the payment out of income of my residuary estate directed in said Codicil, there shall also be paid to Ethel Heberton Harris the sum of One thousand Dollars ($1000.) each month . . . for and during the term of her natural life, and the balance of income only as directed in the Third clause of my said Will"*. Certain words and clauses of the second codicil are also highly significant: the bequest to Mrs. Harris is "in addition to" Miss Barck's bequest; the omission in the second codicil of the word "second" by contrast to the testator's use in the first codicil of the word "first" may be indicative that testator did not intend to rate Mrs. Harris' bequest as secondary although its position clearly indicates that Mrs. Harris' bequest was to be paid *after* Miss Barck's bequest had been "first" paid; a reading of the clause "there shall *also* be paid" and the clause *"the balance of income only as directed in the Third clause of my said will"* clearly evidences that testator contemplated and intended that the primary, at least, source of payment of Mrs. Harris' bequest, was the income from the secondary trust. To paraphrase testator's intent as gleaned from the words employed by him in the second codicil: I (the testator) have already on this day modified my will by another codicil which provides that Miss Barck receive a bequest to be paid out of income from the secondary trust; I now further modify my will by providing that, in addition to Miss Barck's bequest, and after it has been paid out of the income, I direct that Mrs. Harris

be paid a monthly sum of One Thousand Dollars ($1000.) out of the income and that whatever income is left after paying these two bequests shall be distributed as I have directed the income to be distributed under the Third Paragraph of my will. In line with the well established rule of construction which requires that we render every word of a will operative (*Brennan's Estate*, 324 Pa. 410, 415, 188 A. 160) such a construction as we thus place on the second codicil renders operative each word of the second codicil.

Appellant urges that by the testator's employment of the word "only" he negatived any intent that the bequest to Mrs. Harris be paid exclusively out of income. As we read the second codicil the word "only" qualifies the clause "as directed in the Third clause of my said Will" and not the clause "balance of income". Furthermore, the words "annuity" or "annuities" do not appear either in the will or codicils: no mention of "principal" occurs in either codicil; outside of an expressed directtion that Miss Barck's bequest be paid out of income and a clearly implied, if not expressed, direction that Mrs. Harris' bequest be paid out of income, the codicils are eloquently silent on a source of payment other than income. This obviously carefully drawn will and codicil express no intent that the testator intended any invasion of the corpus of the trust to make up the arrearages in the event either or both the bequests were unable to be paid, either partially or fully, from income. The record is barren of any evidence which discloses that Mrs. Harris occupied a status among the objects of testator's bounty in any way superior to that of the relatives expressly provided for under the terms of the trust.

Neither the third nor fourth codicil—the former increasing Miss Barck's bequest to $1000 per month and the latter revoking the original $300,000 trust and sub-

stituting therefor a new trust of $200,000 for the benefit of only one grandniece—adds any illumination on the proper interpretation of the will and the first two codicils.

After a careful examination of the will and codicils it is our opinion that the testator, by the language of the second codicil read in conjunction with the language of the will and first codicil, restricted payment of Mrs. Harris' bequest to income from the trust and that the corpus cannot be invaded or encroached upon for the payment of any deficiency of income to pay her bequest.

Appellant relies primarily on *Johnston's Estate,* 264 Pa. 71, 107 A. 335 and *MacMackin Estate,* supra. In the *Johnston* case both the parties and the court acted upon the assumption that the bequest constituted an "annuity" and the court permitted an invasion of principal to make up an income deficiency not because the bequest was an "annuity" (it was not so called in the will) but rather because the will expressly made the bequest a charge on the realty and the so-called annuitant was the primary object of the testator's bounty. In the *MacMackin* case an invasion of principal was permitted because of a combination of factors:—the bequests were termed "annuities", the testator's intent, gathered from the provisions of his will, was that the payment of the bequests was not restricted to income and the persons receiving the bequests were the principal objects of testator's bounty. Particularly important is the language of Mr. Justice (now Chief Justice) JONES speaking for this court in the *MacMackin* case: "The appellant . . . stresses and relies wholly upon the fact that, in making the bequests of the annual sums to the individuals named in the will, the testator spoke, in that connection, of payment 'from the income' or 'out of the income' of the trust estate. If that were the

extent of the decedent's testamentary words and intendment with respect to the character of the bequests, it would at once have to be conceded that they carried with them no more than a right to participate pro tanto in distributions of income annually derived from the trust estate and that, therefore, they were not annuities in the strict legal signification of that term". Neither the *Johnston* nor the *MacMackin* cases are presently apposite.

In *Sell's Estate,* 4 W.N.C. 14, the testator directed his trustees to lease his realty, apply the rents to payment of taxes, interest on a mortgage and repairs, and "to pay to my beloved wife $300. a year in quarterly payments (if the same be practicable) . . . to continue during the term of her natural life . . . and to pay the balance of said rents to my beloved parents and the survivor of them during the natural life of such survivor"; the court ruled that it was not the testator's intent that a yearly deficit in the widow's annuity be made up from any other part of his estate. In *Brewster's Estate,* 7 Sadler 604, 12 A. 470, testatrix gave her estate to her executors in trust to receive the income and pay the sum of $1000 therefrom toward the maintenance of her children, the balance toward the payment of certain encumbrances on her property and, after the payment of the encumbrances, any excess income was to become part of the principal of the estate; an invasion of principal was not permitted to make up the deficiency in income.

In *Pusey Estate,* supra, where the testator directed his executors and trustees " 'to pay the income accruing on said securities' " to certain named persons in certain specified amounts annually and such was the extent of testator's testamentary directions, we held that, in the absence of any other words which would indicate that the testator intended payment of income de-

ficiency to be made up out of principal, an invasion of principal for that purpose could not be justified.

In *Elmore Estate,* supra, in a Per Curiam opinion, we affirmed, on the opinion of President Judge BOYLE of the Orphan's Court of Allegheny County, that court's refusal to permit an invasion of corpus to pay income arrearages. In that case the testator throughout his will indicated that income was to be the source of payment of the bequests, the words "annuity" or "annuities" did not appear, and, even though the recipients of the bequests were among the primary objects of testator's bounty, that will, as the present will and codicils, contained nothing to indicate any intent on the part of the testator that the bequests be considered as "annuities" carrying with them the right of an invasion of principal for their payment. See also: *Horton v. Cook,* 10 Watts 124; *Higbee Estate,* 70 D. & C. 209, 213.

In the construction and examination of a will, with or without codicils, or a trust, to determine what the testator or the settlor intended in the event the income proves insufficient to pay bequests, certain factors must be considered by the court: (1) the presence or absence of a provision in the will or codicil for an invasion of or an encroachment upon corpus in the event the income becomes insufficient (*Stolfox v. Sugden,* 1 Johns V.C. 234, 70 Eng. Reprint. 410; *In re McKeogh's Will,* 271 N. Y. S. 362, 151 Misc. 327, aff'd. 281 N.Y.S. 1011, 245 App. Div. 750); (2) whether the recipient of the bequest is a primary object of the testator's or settlor's bounty (*MacMackin Estate,* supra); (3) whether the bequest was intended for the maintenance of the annuitant or the recipient of the bequest (*In re Anderson's Estate,* 256 N.Y.S. 529, 143 Misc. 250); (4) was there a direction in the will or in the trust that the bequest be paid "from income" or "out of income" (*Elmore Estate,* supra; *MacMackin Estate,* supra; *Pusey Estate,* supra;

*Lynn Safe Deposit & Trust Company v. Martin et al.,* 308 Mass. 443, 32 N.E. 2d 247; *Kling v. Van Cleeve et al.,* 106 N.J. Eq. 302, 150 A. 684); (5) did the testator or settlor make provision for the disposition of the excess or surplus income (*Brewster's Estate,* supra; *Sell's Estate,* supra); (6) if the words used indicate that the fund from which the annuity or bequest is to be paid shall be kept intact and then paid over to certain specified beneficiaries such fact is some indication of an intent that the bequest shall not be paid from principal (*In re Von Keller's Estate,* 59 N.Y.S. 1079, 28 Misc. 600, aff'd. 62 N.Y.S. 1150, 47 App. Div. 625); (7) the use of the words "annuity" or "annuities" may be strong indication that testator intended that the annuitant or recipient of the bequest should have the right to encroach upon principal (*MacMackin Estate,* supra; *Pusey Estate,* supra); (8) if the will or trust contains no limitation of payment of the bequest from income such a factor may indicate an intent that the principal may be invaded (*Johnston's Estate,* supra; *Singerly's Estate,* 16 D.R. 391; *Fitzpatrick Estate,* 12 D.R. 730).

A careful examination of the present will and codicils leads to the conclusion that the bequest to Mrs. Harris was not intended to be paid out of the corpus of the trust in the event the income became insufficient to pay the monthly amounts of her bequest.

Appellant further urges that, even if payment of the monthly sums to Mrs. Harris were limited to the income, yet such payments were cumulative and hence all arrearages are payable from income currently available until the entire sum due has been distributed.

Mrs. Harris, during her lifetime, received total payments amounting to $27,642.72 and the claim for payments in arrears amounts to over $200,000; even though Mrs. Harris is now dead her estate claims that it is entitled to all the income from the trust until such time

as the arrearages which become due in her lifetime have been fully paid. Appellant relies principally upon *Reed's Estate, (No. 1),* 236 Pa. 572, 577, 85 A. 15, wherein we stated: "We take the general rule to be— it is at least one resting on our own and other authorities, Rudolph's App. 10 Pa. 34; Stewart v. Chambers, 2 Sandford Ch. 382,—that where the income out of which an annuity is to be paid fails in any year or years the arrearages on the annuity are to be paid out of subsequent accumulations, unless there is a plain intent expressed in the will to the contrary". This language has been followed by our courts in applicable situations: *Smith Trust,* 385 Pa. 416, 123 A. 2d 623; *Brock Estate,* 156 Pa. Superior Ct. 616, 619, 41 A. 2d 347; *Estate of Burkhardt,* 22 Leh. Co. L.J. 126; *Wilson's Estate,* 31 Del. Co. Rep. 554. However, as was said in *Smith Trust,* supra, 419, 420: "Whether surplus income from a trust fund may or should be accumulated to meet anticipated future deficiencies or emergencies depends primarily upon whether such was the intention of the creator of the trust as expressed or implied in the trust instrument."

The learned court below has well drawn the distinction between the *Reed* and *Smith* cases and the present situation:

"Smith Estate is not similar in facts to the instant case. Here there is no such language as compels the Court to read into the will and codicils an intent of the testator that the monthly payments to Mrs. Harris should be treated as an annuity and be maintained out of income after her death regardless of what happens to the other income beneficiaries. There is no provision that 'in any event' she should receive such payments in full without regard to his provisions for benefiting his grandnieces. Testator directed that Mrs. Harris should receive one thousand dollars a month 'for and during the term of her

natural life'. He did not employ any language whatsoever to indicate an intention that she should receive such amount 'in any event' or under all circumstances, nor that she should have any priority in payment over Mrs. Barck. As a matter of fact, Mrs. Barck had priority over Mrs. Harris because the testator in the first codicil directed his trustees to 'first pay out of the income' of his residuary estate $500 monthly which was increased to $1,000 in the third codicil. He did not alter that priority despite his having provided for the $1,000 payments to Mrs. Harris in the second codicil.

"Hence, if Reed's Estate were apposite here —and under the facts we do not believe it to be— it would be necessary in following it to set aside *first* for Mrs. Barck's heirs income to be accumulated in amount sufficient to make up deficiencies due her and, under exceptant's contention, in turn to her estate. But we do not believe testator had any thought or desire that such a thing would happen. In no language of will or codicil did he reveal any intention on his part that upon the death of either Mrs. Barck or Mrs. Harris their estates were to be paid over the years to come income necessary to make up deficiencies existing when each of them died. He did not intend to direct his trustees to pay, year in and year out, to the heirs of these two strangers to his blood the amounts they failed to receive and enjoy in their lifetimes and thereby deny any income whatsoever not only to testator's grandnieces during their lives but possibly to their issue during theirs. A trust estate presently worth $88,000 could not possibly earn $225,000 in income in less than 73 years. The deficiency due Mrs. Barck's estate, created over a shorter period, would amount to approximately $217,000, which amount it would take another 62 years to accumulate.

"It is beyond comprehension that testator had any thought in mind that 'in any event', or *whatever happens,* or *under all possible circum-*

*stances,* the full $1,000 monthly should be paid to these ladies and their heirs for 135 years, or possibly over a longer period, depending on the continued preservation of values in trust assets.

"Testator set forth in the seventh paragraph of his will provisions of the character of a spendthrift clause and then said: 'It is my intention to benefit the persons interested, and not their creditors or alienees.'

"He never intended to benefit those he did not know. And it may be presumed that Mrs. Barck and Mrs. Harris knew this and accepted it."

Appellant's last contention is that the auditing judge erred in refusing to admit into evidence certain parol testimony in aid of the construction of the will and codicils. Such evidence was clearly inadmissible and we affirm that which the auditing judge stated in disposing of this contention:

"It should be pointed out that at the audit counsel for the estate of Ethel Heberton Harris, deceased, insisted upon submitting extrinsic evidence in the matter of the question of construction of the will and codicils. He urged that such evidence was appropriate to show 'the relations of the parties' and the 'many facts with respect to their own needs and financial status on or around the time the will and codicils were drawn.' Testimony was offered and received, subject to a timely objection, with grant of exception. I now rule that the parol evidence is inadmissible since there is no latent ambiguity in the will and codicils. Moreover, while the testimony was proffered to evince the surrounding circumstances showing testator's relation to the beneficiaries, their condition or necessities, it went far afield of that category by the inclusion of oral declarations of the testator and thus its main import was to impute and contradict the terms of the will. What was said by Mr. Justice ALLEN M. STEARNE, speaking for the Supreme Court in Wahr Estate, 370 Pa. 382, 387, is ap-

propriate here: 'We agree with the learned court below that parol evidence is inadmissible to explain, construe or contradict the terms of a will, for which principle no citation of authority is necessary.' As for the documentary evidence—records in other estates—showing that testator's two grandnieces had come into substantial inheritances of their own—this, too, although viewed in the light of surrounding circumstances, gives forth no aid to the claimant who contends that Ethel Heberton Harris was in fact an 'annuitant'. Such extrinsic evidence but places one in the 'testator's armchair' at the time he executed his will, as well as the codicils of October 25, 1928, including also the codicil of July 4, 1929, if not also up to the time of his death—when his will and codicils speak—with complete and full realization that, despite any independent financial means of his two grandnieces, testator was content to still benefit his said grandnieces and their descendants, and nowise manifested an intent that Helen Elizabeth Barck and Ethel Heberton Harris should be the sole objects of his bounty."

After a study of the will and the several codicils we are convinced that the bequest to Mrs. Harris was payable solely out of income, that any invasion of the principal or corpus of the trust or any application of income accruing after her death to the payment of income deficiencies which took place during her lifetime would be contrary to the testator's intent and purpose as expressed in the will and codicils.

Judgment affirmed. Costs to be paid by appellant.